## PEOPLE v. O'LOUGHLIN ET ALS.

JUROR, DISQUALIFICATION OF.—Impressions or qualified and conditional opinions formed upon reports, which easily yield to the evidence of witnesses having personal knowledge of the facts and testifying under oath, constitute no valid objection to a juror.

BUT IF THE JUROR'S MIND IS CLOSED AGAINST AND IS IN OPPOSITION TO THE TRUTH as it may be related by the witnesses, resists its force and perverts the judgment, then such juror is disqualified for having "formed an unqualified opinion."

IN CLOSELY BALANCED CASES, MUCH WEIGHT SHOULD BE GIVEN to the judgment of the trial court before whom the juror appears, and by whom his manner and conduct as well as his language are scrutinized.

JUROR, PEREMPTORY CHALLENGE OF.—One of several defendants jointly indicted and on trial can not for himself alone peremptorily challenge a juror; and the same rule applies where all the defendants, jointly challenging, have exhausted their challenges under an act of congress, even though they claim the right to severally challenge under a territorial statute.

"PARTY," MEANING OF.—The word "party" imports the person or persons having a joint right or liability, whether one or more.

CRIMINAL TRIAL, EXCLUSION OF WITNESSES ON—The exclusion of witnesses from the court-room during the progress of a criminal trial is within the discretion of the court. It is not error for the trial court to permit

the prosecution to call a witness who has inadvertently violated its order excluding witnesses.

CRIMINAL LAW—RIOT—"FORCE AND VIOLENCE"—"DISTURBANCE OF PUBLIC PEACE"—WHAT CONSTITUTES—DECLARATIONS OF ONE RIOTER, WHEN ADMISSIBLE.—S., a mining company, having reduced the wages of its employees, the defendants, thirteen in number, and 150 others, miners, some employees of S. and others not, comprising a miners' union, in pursuance of a resolution by them passed in mass meeting in Miners' Union hall, and for the purpose of resisting such reduction of wages, organized in the village of Silver Reef, marched through the village to the neighboring mines, ordered therefrom all union men, and having collected a force of 300 men, among whom were all of the defendants, marched back through the village to the mining properties of S., and there appointed from their number a committee, which, in the presence and view of the men outside, and pursuant to their behests, entered the mining works of S. and demanded of the employees there in charge that they shut down all works, quit possession of the shafts, shaft-houses, buildings, and works, and surrendered the same to such committee, and not to start up the works again until ordered so to do by the union, which demands were acceded to by the employees of S., whereupon the body of men marched away, leaving their committee, one of whom was the defendant C., in charge and in possession of such works.

*Held :* 1. That if, by the resolution, meeting, marching, and demands of defendants and their companions, and the manner and circumstances under which the same were done and accompanied, well-grounded fear or apprehension of bodily harm or injury would be raised in the minds of reasonable men of ordinary courage and firmness, by a resistance to such demands, and that well-grounded fears existed in the minds of the residents of Silver Reef for the safety of life or security of property—the same constituted a breach of the "public peace" by "force and violence," within the meaning of the act defining riot.

2. That the terms "force" and "violence" do not necessarily mean the actual use of physical force accompanied with turbulence or violence; but any unlawful act, however apparently peaceable and quiet, when done with such numbers, in such manner, and under such circumstances as show that the actors intend to and are capable of carrying out, and do so carry out, an unlawful purpose in an unlawful manner, rendering resistance thereto apparently, in the minds of reasonable men of ordinary courage, dangerous to life or property, is such "force" and "violence" as is contemplated by the statute.

3. That evidence of the effect upon the minds and the feelings of the residents of Silver Reef as to fear for the security of life or property, occasioned by these unlawful acts, was admissible, as tending to show a breach of the public peace, and to show this, proof might be offered of the declarations, expressions of fear, and acts of such residents, during and while the acts of the defendants were being done and performed.

4. That the acts and declarations of the defendant C., one of the committee of miners in charge of the works of S., while in possession in pursuance of the orders of the other defendants and other miners comprising the miners' union, are admissible n evidence against all the defendants on trial.

APPEAL from the second district court. The territorial criminal practice act of 1878, upon the subject of challenges to jurors, reads as follows:

"Sec. 225.   When several defendants are tried together, they can not sever their challenges, but must join therein."

"Sec. 238.   If the offense charged is punishable with death or imprisonment in the penitentiary for life, the defendant is entitled to ten and the territory to five peremptory challenges. On a trial for any other offense the defendant is entitled to five and the territory to three peremptory challenges."

Riot is punishable by fine or imprisonment not exceeding two years.   The other facts appear in the opinion.

*Arthur Brown,* for the appellants.

The juror Louder was not a competent juror : *Stephens* v. *People,* 38 Mich. 739 ; *Staup* v. *Commonwealth,* 74 Pa. St. 458 ; *Albrecht* v. *Walker,* 73 Ill. 69 ; *People* v. *Edwards,* 41 Cal. 641 ; *People* v. *Brotherton,* 43 Id. 530; *Miles* v. *U. S.,* 102 U. S.

If any doubt existed as to the competency of the juror, defendant was entitled to the benefit of that doubt : *Hall* v. *People,* 13 Mich.

By the terms of the Poland bill, " each party, whether in civil or criminal cases, shall be allowed three peremptory challenges." What is meant by " each party" in a criminal case ?

In a civil case the term " each party" may be determined by the nature of the issues : *Stroh* v. *Hinchman,* 37 Mich. 490.

In a criminal case we can determine the meaning by looking at the nature of the subject, the nature of the issues, and the history of the law on the subject. Each defendant must plead for himself in person ; each makes a separate issue with the people on the question of his guilt ; if convicted, each must suffer punishment for himself, or each may be pardoned on his own merits. Any one could appeal without affecting others. In all this there is a distinction between criminal and civil cases : in a civil case one judgment only is recorded— one satisfaction pays for all ; therefore, in criminal cases the trial is necessarily separated to a certain extent, and the

right to challenge peremptorily is one of the first rights of a defendant charged with crime: *Sadourley* v. *McGee*, 4 J. J. Marsh. 267.

The history of the law shows that "each party" means each defendant—each person. At common law each defendant was allowed separate challenges: 2 Hale P. C. 268; 1 Bishop's Cr. Proc., secs. 1028–1030; *U. S.* v. *Marchant*, 12 Wheat. 480; 3 Whart. Ev., sec. 3136; *Washington* v. *State*, 17 Wis. 148; *Bixbee* v. *Ohio*, 6 Ohio, 86; *Maton* v. *People*, 15 Ill. 539.

Chatham's declaration and act were inadmissible against himself, because one only can not be guilty of a riot; as to the other defendants, it was hearsay—all of the defendants or none were guilty of riot: *Stone* v. *Segur*, 11 Allen, 571; 1 Greenl. Ev., sec. 233; 2 Whart. Ev., sec. 1206.

The court below erred in its instructions to the jury as to what constituted "force" and "violence" within the statute. Wharton says: To constitute riot there must be an assembling, "accompanied by such circumstances, either of actual force or violence, as were calculated to inspire people with terror, such as being armed, using threatening speeches, turbulent gestures, or the like." Similar definitions are to be found in all other authors: Roscoe's Cr. Ev. 901; 1 Russ. 267; 1 Bish. 1147; 2 Bouv. Law Dict., tit. Riot.

To constitute riot the public peace must be disturbed. Disturbing the public peace means actual, unlawful, physical, violence. The public can not be disturbed by an orderly, quiet meeting, by the procession of miners walking in twos, and making a gentlemanly request of an engineer.

*Philip T. Van Zile, U. S. attorney, Zera Snow, ass't U. S. attorney,* and *Presly Denny,* for the respondent.

The great mass of exceptions relied upon relate to questions asked, which, so far as the record shows, were unanswered.

He who asserts error must show it. Every presumption of law is against him: *People* v. *Winter*, 29 Cal. 658; *People* v. *Williams*, 45 Id. 25.

In the last case the court say: "The question as asked of the witness Rupley, even if objectionable in itself, does not

seem to have been answered by him—at least no answer appears in the record; and in that view, the question asked and objection taken became mere abstractions."

The objection that the declarations of Chatham were inadmissible is disposed of by the case of *People* v. *Williams, supra* (see another part of the opinion), because it does not appear but that all defendants were present at the conversation sought for. But the conversation was evidence against such of the defendants as were present (assuming now that all were not present, though the bill of exceptions does not show the fact); and while it is true, "Chatham * * * alone could not be guilty of riot," it was not incumbent on the prosecution to prove a riot by a single word or act of Chatham or any other defendant; it was only a link in the chain, and if there was anything in this evidence admissible against some but not against all, it was the duty of defendants' counsel to ask instructions, and such instructions were asked and given.

It is not the law, as counsel states, that all of the defendants or none are guilty of riot. Some may be convicted, others acquitted: *Rex* v. *Scott*, 3 Burr. 1262; authorities in note to *Commonwealth* v. *Runnels*, 10 Mass. 520; *Com.* v. *Berry*, 5 Gray, 93.

Chatham's declarations, however, were admissible against all of the defendants: *People* v. *Trim*, 39 Cal. 75; *People* v. *Geiger*, 49 Id. 643; 3 Greenl. Ev., sec. 221.

The defendants elected to be tried jointly, though they might have severed in their trials: Crim. Prac. Act, sec. 262.

The practice act contemplates that all defendants tried together are one party, the people another. There was a joint arraignment with several pleas, because each defendant must plead in person; there was but one verdict, there will be but one judgment.

The word "party" may mean one or several, united in a certain relation, and stands for plaintiff or defendant, and includes all the persons belonging to the particular class: *People* v. *Croton Aqueduct Board*, 5 Abb. Pr. 316; *Sheldon* v. *Quinton*, 5 Hill, 541; *Waterford* v. *Whitehall Tur. Co.*, 9 Barb. 161; *Stone* v. *Segur*, cited by appellants' counsel.

This view is strengthened by the peculiar language of the Poland bill: "Each party, whether in civil or criminal cases

[applying the same rule for "party" to both], shall be allowed," etc., * * * "except in capital cases, when the *prosecution* and *defense* [all the defendents on trial constitute the defense, not a single defendant] shall each be allowed fifteen."

The right to sever in peremptory challenges was properly denied: Prac. Act, sec. 225; *People* v. *McCalla*, 8 Cal. 303; *People* v. *Thayer*, 1 Park. Cr. 595; 1 Bishop's Cr. Proc. 1032; *People* v. *Canniff*, 2 Park. Cr. 581; *People* v. *Master*, 3 Id. 617.

The construction claimed by appellants' counsel would practically defeat the trial of many civil cases; and had the defendants been guilty of murder instead of riot, they could never have been tried.

The force or violence may be either actual force, or constructive by threats, or by putting in fear of person or property: 3 Greenl. Ev., secs. 223, 229, 231, note 2.

It may consist of large numbers, who manifest an intent to use force if necessary: Justice Curtis' opinion, 3 Greenl. Ev., sec. 195, note 2; *McCauly* v. *Weller*, 12 Cal. 528.

Force is defined by Bouvier to be, "Strength applied; active power; power put in motion. Actual force, where strength is actually applied, or the means of applying it are at hand. Implied force is that which is implied from the commission of any unlawful act:" 1 Bouv. Law Dict. 578; see 2 Id. 641, tit. Violence.

"That force which is employed against common right, against the laws, against public liberty. In cases of robbery, in order to convict it is necessary to prove that the act was done with violence, but this violence is not confined to an actual assault of the person, by beating, forcibly wresting, etc.; but on the contrary, whatever goes to intimidate or overawe by the apprehension of violence, or by fear of life, with a view to compel the delivery of property, falls equally within its limits:" See 2 Russell on Crimes, 61; 4 Binn. 379.

Any offense or crime committed is undoubtedly a disturbance of the public peace. The defendants by taking unlawful and forcible possession and detaining the same, of the Savage and Buckeye mine, committed a crime: Comp. L., sec. 236, p. 616.

The assembling together by defendants to compel the Stormont to cease and shut down their works, and if they did

not the miners' union would shut it down for them, was an assembling to do an unlawful act, and made it an unlawful assembly, and was an offense: Comp. L., sec. 226, p. 615.

The fear and alarm to the community may, itself alone, be a disturbance of the public peace, and is a material element in the commission of the offense.

A breach of the peace may be committed by causing fear alone. An assault is a breach of the peace, yet an assault may be committed by putting a party in fear alone, and is committed whenever a well-founded apprehension of immediate peril from a force already or partly put in motion is created: 1 Bish. Cr. L. 548; 2 Id. 32.

The instructions on the whole were correct. Any disturbance by three or more of a person in the lawful enjoyment or exercise of his rights is a riot: *Com.* v. *Runnels,* 10 Mass. 518; see *State* v. *Snow,* 18 Me. 346.

TWISS, J.:

The indictment in this case charges the defendants, and divers other persons, whose names are unknown to the grand jurors, to the number of about two hundred and fifty, of the crime of riot on the first day of February, 1881, at the county of Washington, in the territory of Utah; that by the use of force and violence, and by threats to then and there use force and violence, accompanied by the immediate power of execution, and acting together without authority of law, did then and there feloniously disturb the public peace, etc., "and did take unlawful and forcible possession of the property of the Stormont Mining Company, * * * and did by the use of force and violence, and threats to use force and violence, accompanied by the immediate power of execution, unlawfully, forcibly, and feloniously drive away from the possession of the said property, to wit, the Buckeye and Savage mines, one W. I. Allen, and other employees of said company, having charge and control of said property and mines, and engaged at work thereon, and did feloniously and unlawfully, by the use of force and violence as aforesaid, compel and force said Allen and said employees to stop and quit work thereon, and leave the same, and then and there took forcible possession of the same, to the great damage of said company,

and to the terror and disturbance of said employees, and of the public peace, contrary to the form of the statutes of Utah territory in such case made and provided, and against the peace and dignity of the people aforesaid."

Each of the defendants pleaded not guilty. No one of the defendants requiring a separate trial, they were jointly tried, and the jury found a verdict of guilty as to all of them. A motion for a new trial was overruled, and the case appealed to this court.

The error first alleged is the overruling of the challenge on the part of the defendants, of John Lowder, one of the jurors, who upon his *voire dire* said he had heard a report of the facts of the case, from which he had formed an opinion, which he believed to be true, but he did not know that he had ever expressed it; that it would take evidence to overcome such belief; " I believe it like other reports I hear ;" that it was a conditional and not an unconditional opinion ; the condition was as to the truth of the story he had heard ; " it was unconditional if the report was true;" when " I heard the story, I believed there was something in it, of course," and the conditions about it were, " in case the transaction did really take place," that he would require proof in the case before he would be willing to act. That he had no opinion, bias, or prejudice, or belief as to the guilt or innocence of either of the defendants, that would prevent him from acting impartially as a juryman. The challenge was made under the statutory provision disqualifying a juror who has " formed or expressed an unqualified opinion or belief that the prisoner is guilty or not guilty of the offense charged."

We are of the opinion that there was no error in overruling the challenge. The condition of this juror's mind was such as would usually or naturally be formed by any person, upon hearing a report of an alleged commission of crime. He had heard a story; he believed it; he says, " I believed there was something in it, of course." " Nobody disputed it; I believed it like other reports I hear." It is obvious that this opinion or belief was liable to be changed by the statements of the next person he might meet; this is not a conviction of the mind, a fixed conclusion, " an unqualified opinion or belief."

Impressions, or qualified or conditional opinions, formed upon the mere hearing of a report, which, in the mind of an honest man capable of acting as a juror, easily yield to the testimony of witnesses under the sanction of an oath, having personal knowledge of the facts, constitute no objection to a juror; but an unqualified opinion or belief which closes the mind against the testimony presented in opposition to it, resists its force, and perverts the judgment, does constitute a good and valid objection; an unqualified opinion or belief is fixed and certain, and is incompatible with reasonable doubt and uncertainty, and is not dependent upon the existence or non-existence of any extrinsic fact.   The defendants were entitled to a trial by an impartial jury.   This provision of our statute is a simplification of the common law, and the opinions of the state courts, where no statute exists, or where the same or similar statutes are in force, are authority with us in applying the facts of this case to the law, and deducing conclusions.   The question at issue is, Do the statements of the juror upon his *voire dire* show him to have had, at the time, an unqualified opinion or belief as to the guilt or innocence of the defendant?   In *Commonwealth* v. *Webster*, 5 Cush. 297, Shaw, C. J., said: "The opinion or judgment must be something more than a vague impression formed from casual conversations with others, or from reading abbreviated newspaper reports.   It must be such an opinion upon the merits of the question as would be likely to bias or prevent a candid judgment from a full hearing of the evidence."   This is clearly the law: *State* v. *Wilson*, 38 Conn. 126; *Curley* v. *Commonwealth*, 84 Pa. St. 151; *Staup* v. *Commonwealth*, 74 Id. 458; *People* v. *Reynolds*, 16 Cal. 128; *Gardner* v. *People*, 3 Scam. 83.   In closely balanced cases the appearance of the juror, the manner in which he is examined by the counsel, and its effect upon him, sometimes justly have great weight with the trial judge.   In view of this, the court in *Ortwein* v. *Commonwealth*, 76 Pa. St. 414, said: "Much weight, therefore, is to be given to the judgment of the court below, in whose presence the juror appears, and by whom his manner and conduct, as well as his language, are scrutinized."

The defendant Murphy for himself alone, and not for himself and the other defendants, peremptorily challenged the

juror Parry, which challenge was objected to by the prosecution, and the objection was sustained by the court. In support of this challenge, it was claimed under the act of congress, June 23, 1874 (known as the Poland bill), providing that "each party, whether in civil or criminal cases, shall be allowed three peremptory challenges, except in capital cases, where the prosecution and defense shall each be allowed fifteen challenges," that each individual defendant had the right to three peremptory challenges; and in support of this claim, the counsel urged that in criminal cases, each defendant must plead for himself in person, each makes a separate issue with the people on the question of his guilt; if convicted, each must suffer punishment for himself, or each may be pardoned on his own merits; one can appeal without affecting another. In all this, it is claimed there is a distinction between criminal and civil cases. In a civil case one judgment only is recorded, one satisfaction pays for all, and therefore in a criminal case the trial is necessarily separate to a certain extent; in other words, the word "party," as used in the statute, means each individual defendant. This reasoning, although plausible and ingenious, is not good. If it is, these thirteen defendants had the right to make in the aggregate thirty-nine peremptory challenges. The words "each party" seem to have the same force in the first clause of the provision above quoted as the words "prosecution and defense," have in the last clause; each of these expressions is synonymous with either party to the action, the plaintiff and defendant, regardless as to whether one or more than one person is included as plaintiff or defendant. The word "party" has its legal and technical import and signification, which is to be given to it at all times, except when by its use it is clearly intended that some other meaning or intent is given to it: *State* v. *Reed*, 47 N. H. 466. Bouvier says: "A party in law may be said so be those united in interest in the performance of an act; it may then be composed of one or more persons."

In *Stone* v. *Segur*, 11 Allen, 568, the court says: "It imports the person or persons in whom a joint legal right, interest, or title is vested, or against whom a joint liability exists, and is properly applied to one person or to many persons, according to the subject-matter of the contract or

cause of action; relates to or embraces a sole or joint interest or title or liability."

With this definition, accepted and announced by high legal authority as the correct import of the word in both civil and criminal cases, it is not at all probable that if the use or force intended to be given to it in the statute was that now claimed by the appellants, such intention would not have been expressed in unmistakable language, and such an important matter not left open to construction, with the ordinary legal and technical sense of the word opposed to such intended use.   If our national legislature intended that the words "each party," in the provision in question, should mean one thing in a civil action and another and quite a different thing in a criminal action, the language used is an instance of negligent and bungling legislation never before equaled, we believe, in any act framed by that body; but such was not the intent, and this construction claimed by the appellants is an instance of extreme forced construction, inconsistent with the letter and spirit of the statute and the intention of its makers. The right of peremptory challenge is sanctioned by the statute, and the defendants were entitled to the full benefit of it, but no greater than the legal signification of the language used gives to them.   By this claim of the appellants we are asked, in effect, to interpolate into the statute an exception containing a provision that the word "party" in criminal cases means each individual defendant, whether one or more. This we can not do.   We have no power to insert qualifications, ingraft exceptions, or make modifications, with the intention of creating a provision not expressed in the statute: Sedgwick's Stat. & Const. L. 326.

By the statute, riot is made a felony, and section 262 of the criminal practice act gives to any defendant jointly indicted with another, or others, for a felony, the right of a separate trial if he requires it.   All the defendants having waived this privilege, and declared their election to be tried jointly, their defence was joint and not several, and no one of them had authority to control the conduct of the defense. Their challenges should have been joint, not several: *People* v. *McCalla*, 8 Cal. 303; *People* v. *Thayer*, 1 Park. Cr. 595.

The defendant Enright peremptorily challenged the juror

Lowder. This challenge was made under the provisions of section 238 of the criminal procedure act of 1878, which by its terms purports to give the defendant in a case like this five peremptory challenges. The defendants having jointly availed themselves of the provisions of the act of congress fixing the number of peremptory challenges at three, could not then be allowed to make individual peremptory challenges under the statute of the territory. The challenge was properly overruled.

Upon the request of the counsel for the defendants, with the assent of counsel for the people, the court ordered that all witnesses should be excluded from the court-room during the opening statement of counsel for the prosecution and the examination of witnesses. After the opening statement on the part of the prosecution had been made, W. I. Allen was called as a witness by the prosecution; the defendants' counsel objected to his being sworn, because he had remained in the court-room during the opening statement of the counsel for the people, in violation of the order of the court.

The counsel for the people and the witness Allen stated they did not understand that the order of the court applied to the exclusion of witnesses during the opening statement for the people, but only while evidence was being offered and received. Allen said he did not intentionally violate the order of the court; that if he had understood the order as applying to the opening statement of the prosecution, he would not have been present. The counsel for the people then asked the court to so modify the order as to allow the witness to testify, and to remain in the court-room during all the trial, as he was necessary to them in aid of the prosecution, which request was granted. The witness Allen testified, and remained in the court-room during the trial. This ruling of the court is assigned as error. We are of the opinion that there was no error in this ruling, permitting the witness to testify and to remain in the court-room during the trial. As he did not understand the order of the court to apply to the opening statement of counsel for the people, he was not in intentional contempt. The modification of the order was a matter of discretion, as was also the making of it at first. Allowing the witness to testify and afterwards to remain in the court-room

was a matter of discretion, and not error: 1 Greenl. Ev., sec. 432, and notes; *People* v. *Garnett*, 29 Cal. 629.

Although the appellants have placed on record forty-one assignments of error, the brief of counsel contains but six points or divisions of argument, and no allusion is made to the greater part of the assignments. The first three points have been considered and decided; the fourth, fifth, and sixth, in which are grouped such of the errors assigned as are undisposed of and relied upon in argument, remain to be considered. An intelligent understanding of these alleged errors necessitates a cognizance of the following portion of the record: " The evidence for the prosecution tended to show, among other things, that on the morning of the first of February, 1881, the Stormont Mining Company, mentioned in the indictment, by its manager and officer, issued an order reducing the wages of its miners working for it from four dollars per day to three dollars and fifty cents per day, in all its works except at the Savage shaft, where, it was announced, the old rate of wages, to wit, four dollars per day, would be continued; which reduction came to the knowledge of an organization then existing in Silver Reef, known as the ' miners' union.' Thereupon the defendants and others comprising this union met together, to the number of about one hundred and fifty, in miners' union hall in Silver Reef, in Washington county, Utah, at which meeting the defendant O'Loughlin, president of said union, presided. That after discussion it was unanimously voted, among other things, that the miners' union and all its members would reject and resist such reduction, and would, as a miners' union, and in a body, order the works of said Stormont company to cease and shut down, and that if they, the said company, did not shut down, that they, the union and its members, would shut down the Savage works for them.

" That, in pursuance of said voting, said meeting immediately adjourned and organized in the streets of the village of Silver Reef, and marched in a column of twos to the Barbee and Walker mine through the streets, and then ordered out all the miners there working who were members of the union, who joined the procession; and from there back through the village to the Tecumseh mine, in lower Silver Reef, and there ordered out all union men to join the procession, and

from there, having collected three hundred and four miners, among whom were all these defendants, marched in a body, in a column of twos (the president, O'Loughlin, riding horseback on the lead, or' in command, the defendant Hanley carrying the United States flag), to the Savage shaft, surrounded the shaft building, and the president thereupon selected a committee of ten from said miners, among whom was the defendant O'Loughlin and Dee, *alias* Chatham, which committee proceeded inside, and in presence of the miners outside ordered the fires of the engines to be drawn, and the works to close down and cease, which orders were obeyed. The works were closed down, and the shaft began to fill with water, while the employees of said company were ordered from the building, the committee remaining in possession of the property, the defendant Chatham remarking, in the presence of the committee, to the employees, 'You may go now, right off; we have possesssion.'

"The defendant O'Loughlin, while a witness on the stand, among other things, testified that the union had power to carry out its orders. The witness Fleming, among other things, testified he was in the employ of the Stormont company at the Savage shaft when the miners' union came there; so also was David McKelvy, the engineer in charge; the orders given by defendant O'Loughlin were: 'You are to cease all work on the Savage shaft and draw the fire, and not start up until ordered by the union.' I asked to go into the mine and put out the light, and, after consultation, one of the committee told me no one would be allowed in the mine, and ordered McKelvy not to move his engine. When the orders came to cease work, McKelvy replied, 'All right, I know what that means; I have been there before,' or something to that effect."

The defense claims that "to constitute riot, the public peace must be disturbed. Disturbing the public peace means actual, unlawful, physical violence. The public peace can not be disturbed by an orderly, quiet meeting, by the procession of miners walking in twos, and making a gentlemanly request of an engineer. Even if the acts complained of were unlawful and were trespass, they could not constitute riot, unless done

in a tumultuous manner calculated to disturb the public peace."

Let us examine this position in the light of the statute of this territory, and other recognized authorities. In *Commonwealth* v. *Runnels*, 10 Mass. 518, the court says: "To disturb another in the enjoyment of a lawful right is a trespass; and if it is done by numbers unlawfully combined, the same act is a riot." Bish. Cr. L., sec. 1143, defines riot as follows: "A riot is such disorderly conduct in three or more assembled persons actually accomplishing some object, as is calculated to terrify others."

This learned author, in quoting Lord Coke's definition of riot, says: "Riot, in the common law, signifieth when three or more do any unlawful act, as to beat any man, or to hurt him in his park, chase, or warren, or to enter or take possession of another man's land, or to cut or destroy his corn, grass, or other profit."

In section 1147 Mr. Bishop says: "The principal point to be here considered is, that the act must be one calculated to create apprehension of danger in the minds of persons other than the rioters;" and again, in section 1148, the same author says: "The ingredient of terror excited, necessary in a riot, does not require that more persons than one be alarmed."

The court below instructed the jury as to the definition of riot, and the force necessary under the statute to make out the element of force in case of riot, as follows: "Riot, by the statute of this territory, is defined to be 'any use of force or violence disturbing the public peace, or any threat to use such force or violence, if accompanied by immediate power of execution, by two or more persons acting together and without authority of law:' Comp. L., p. 614, sec. 2054.

"From this definition we can determine what it is necessary to prove in order to make out a case of riot. 1. A riot can not be committed by one person alone. The statute provides that there must be two or more persons. Therefore, in order to make out a case it is incumbent upon the prosecution to prove beyond a reasonable doubt that there were two or more of the defendants engaged in what they allege was the riot. 2. That two or more persons acted without authority of law, and that they so acted together. 3. That the two or

more persons so acting without authority of law used or threatened to use force or violence. 4. That the two or more persons so acting together without authority of law, and using or threatening to use force or violence, were accompanied with—had present with them—the immediate power of executing their purpose. 5. That the two or more persons so acting together without authority of law, and using force or violence, or threatening to use force or violence, accompanied by immediate power of execution, disturbed the public peace.

"One of the elements of a riot, as defined by our statute, is the use of force or violence, or threatening to use force or violence if such threatening is accompanied by immediate power of execution. It was not necessary, in order to use the force meant by the statute, that the defendants and those accompanying them should have been armed with guns, pistols, or clubs, or any kind of weapons. The facts, if you find such to be the facts, that they, accompanied by a large body of men, marched in a procession under the command or direction of their president to the Savage mine and hoisting works, and there were halted by their commanding officer, who selected from among them a committee, who ordered or demanded, or stated the demand of this body of men to the persons in charge of the works, namely, that they must cease working, or that in substance, and that this large body of men remaining outside, near to, and in view of the persons employed by the Stormont company, and in charge of said works. These facts, if you find them to exist, and find from them and all the circumstances in evidence in the case that the officers and men having in charge said works and property of said company feared or believed that bodily harm to themselves, or severe injury or damage to the said works or property in their charge, would result from a refusal to comply with the command or request, and that the circumstances in which such officers or men in charge of said works or property were placed, were such as would in your opinion justify such belief in the minds of persons possessed of ordinary firmness and reason, are sufficient use of force to make out, so far as the element of force is necessary, a case of riot."

In regard to what constitutes a disturbance of the public

peace within the intent of the statute, the court instructed the jury in substance as follows: "If the defendants, with others, met in Miners' Union hall on the first day of February, 1881, and resolved to march in a body through the town of Silver Reef, and to close down the works and mining machinery and property of the Stormont company, and that they did so march, and by the use of such force as I have before mentioned did order or direct to be closed down the said works and hinder, obstruct, and prevent, without authority of law, the said Stormont company from operating the Savage shaft in the hoisting works mentioned in the indictment; and if you further find that by means of and from the manner in which said defendants and others associated with them met in said hall, and from the manner in which said marching was done and said works closed down, feelings of fear or terror, of disquiet or unrest, and insecurity as to the safety of the property were created or engendered among the residents of Silver Reef, then and in such case I instruct you that this is such a disturbance of the public peace as is contemplated by the statute defining riot, under which the defendants stand charged."

It is claimed with much earnestness that these instructions are erroneous, as they do not correctly state the law as to the amount of force necessary to make it a component part of riot; that there must have been "such actual force or violence as were calculated to inspire people with terror, such as being armed, using threatening speeches, turbulent gestures, or the like." Our statute in defining riot says: "Any use of force or violence disturbing the public peace, or any threats to use force or violence, if accompanied by immediate power of execution, etc., is riot." These words do not imply that such use of or threat to use force or violence should be noisy, boisterous, or tumultuous, or be accompanied with threatening speeches or turbulent gestures, or that the men using force, or threatening to use it, need be armed. A riot does not so much depend upon the strength of voice as upon the intent or purpose, and the power of immediately executing the purpose. Force in animate and inanimate nature is not necessarily boisterous, nor the execution of it attended with noise and turbulence. The man who silently and perhaps with extreme politeness of manner administers a few grains of strychnine to

his unsuspecting victim uses force, and is just as much a murderer as the man whose murderous intent is accomplished by the flash and explosion of gunpowder in the shot-gun. It is not so much the manner in which a thing is done as the execution of the intent that constitutes crime. A half dozen brigands may demand the pocket-book of a traveler without the least exhibition of turbulence, or violence in manner or gesture, and this demand may be in the form of a request, couched in terms of most exquisite politeness, and behind it all exists a diabolism.that does not hesitate to take human life upon the least resistance or hesitation to deliver; and is it any the less robbery because the victim chooses to give up his money rather than to further risk his life, although there is in fact no exhibition of violence, yet every act and word implies not only violence, but power and force, a resistance of which endangers human life?

O'Loughlin, in giving the order to those in charge of the Savage shaft, "You are to cease all work on the Savage shaft, and draw the fire, and not start up until ordered by the union," was carrying out the vote adopted by the union, and "the union had power to carry out its orders." This was an order full of significance, expressing an unlawful purpose, and being backed by three hundred men, resistance by those to whom it was directed would have been useless, and would undoubtedly have been followed by consequences which the men in charge were wise in avoiding.

The evidence does not show that the defendants or their associates, at their meeting in Miners' Union hall, or on their march through the streets, or at the time of the order of O'Loughlin "to cease work," etc., was made, were either boisterous or noisy; but it does show that these defendants, and those acting with them, were regardless of the rights and property of others; that they voted to stop the works and business of the Stormont Mining Company; that they went to the premises with force sufficient to do it, and without right obtained possession of them, closed down the works, stopped business, retained possession, and excluded the lawful occupants therefrom. The question whether the acts of the defendants and those with whom they were acting were a sufficient use of force, or a threat to use force with the power of

immediately executing the same, and were such a breach of the public peace as to be within the intent of the statute defining riot, was properly submitted to the jury by the court: *Bell* v. *Mulloy*, 61 Ill. 167; *State* v. *Straw*, 33 Me. 554; 3 Greenl. Ev., secs. 231, 232, 233; 1 Bish. Cr. L., secs. 546, 548, 560, 562.

The testimony of Allen, the superintendent of the mining works of the Stormont company, that defendant Chatham, one of the committee appointed to shut down and stop the works at the Savage shaft and premises, refused to allow Allen to enter the works on the same day, but after the procession and crowd had left, was properly admitted; his possession with that of others of the committee with him was in obedience to the vote at the hall, and was carrying out the purpose for which the procession was formed, the march performed, and the committee selected; his acts in executing the expressed will of his associates and co-defendants were competent evidence, not only against himself, but them also.

Testimony tending to show that the marching of the miners' union, their vote at the hall, and the proceedings at the Savage shaft caused a general feeling of insecurity and alarm, and that the witnesses themselves had such feelings, and that they at the time heard others express the same, was rightly admitted; it was competent to prove in this way that the actions of the defendants and their associates did disturb the public peace.

The defense asked for a large number of instructions, a great portion of which were given. Upon an examination of them and the other instructions contained in the charge of the court, we are all of the opinion that the charge to the jury was quite as favorable to the defense as the law permitted, and that there was no error in refusing those not given.

The order of the district court overruling the motion for a new trial is affirmed.

HUNTER, C. J., and EMERSON, J., concurred.