BOWEN, Judge.
The defendant was found guilty in Birmingham Municipal Court of the offenses of resisting arrest and riot. Appeal was taken on both counts to the Circuit Court of Jefferson County. The jury returned a verdict of guilty on both counts and the defendant was fined $500.00 on the resisting arrest charge and sentenced to perform hard labor for sixty (60) days on the riot charge. Because the defendant failed to pay the fine of $500.00, additional punishment was set at 120 days hard labor. The defendant was declared indigent and appointed counsel for this appeal.
On March 6, 1980, the defendant and at least six other members of the “May Day Committee” went to the cafeteria at the University of Alabama in Birmingham Hospital. At this time about 700 hospital employees and doctors were eating lunch. The defendant and one of his companions, Ms. Jue, held a large banner proclaiming the coming of May Day. Together they shouted their views against “imperialism” and about the “oppression of the working man.” *67 The other five members of the committee solicited money and handed out pamphlets. The group had not obtained permission to conduct any type of demonstration.
University Police Officer Bradford was called to the lunchroom and, when he arrived, he asked defendant and Ms. Jue to refrain from their loud and boisterous conduct and leave the premises. They refused and continued to talk. The officer then attempted to place the defendant under arrest. As Officer Bradford was trying to handcuff the defendant, the defendant turned around and pulled away, yelling, “Here comes the goon squad” and “goddamn pigs”. A scuffle ensued and another member of the group, Ernest Brown, struck Officer Bradford several times. There was evidence that four members of the group were “just milling around at this time in another portion of the cafeteria.” Other officers who had arrived on the scene subdued Ms. Jue, Mr. Brown and the defendant and removed them from the cafeteria. A crowd of employees had gathered and were watching the commotion. It was testified that many of the employees clapped when those arrested were carried off. All seven members of the group were arrested.
This is a case of first impression. A search reveals no case law in Alabama interpreting the riot statute.
I
The defendant argues that the evidence does not sustain his conviction for riot. Section 13A-11-3, Alabama Code 1975 (Amended 1977) defines the offense of riot:
“A person commits the crime of riot if, with five or more other persons, he wrongfully engages in tumultuous and violent conduct and thereby intentionally or recklessly causes or creates a grave risk of public terror or alarm.”
Therefore, to support a conviction of riot the prosecution has the burden of proving:
(1) The defendant acted with five or more other persons.
(2) He wrongfully engaged in tumultuous and violent conduct.
(3)The defendant’s conduct either intentionally or recklessly caused or created a grave risk of public terror or alarm.
In arguing that the prosecution did not prove the elements of riot, the defendant places great significance upon the fact that there was no violent conduct on anyone’s part before the police arrived. This reliance is misplaced and without legal significance.
The evidence shows and it cannot reasonably be disputed that the defendant engaged in no “tumultuous and violent conduct” until after the initiation of his confrontation with Officer Bradford.
“The phrase ‘tumultuous and violent conduct’, however, in itself clearly means much more than mere loud noise or disturbance. It is designed to connote frightening mob behavior involving ominous threats of injury, stone throwing or other such terrorizing acts.” Commentary to New York Revised Penal Law, Section 240.05.
The phrase “tumultuous behavior” requires more than mere “aggressive solicitation”. State v. Anonymous, 33 Conn.Sup. 93, 363 A.2d 772, 774 (1976).
While the conduct of the defendant and his companions may have been distracting, annoying, loud and even profane and obscene, it did not constitute “tumultuous and violent conduct” prior to the arrival of the police.
However, once the police arrived, the character and complexion of the demonstrators’ conduct changed. The defendant forcibly resisted arrest and was aided in his resistance by Ms. Jue and Mr. Brown. Brown managed to get Officer Bradford’s pistol and attempted to fire it. Blows were struck against the police and those occupants of the cafeteria who had come to aid the officers. Tables and chairs were overturned during the “scuffle”. There was testimony that people throughout the cafeteria were yelling, screaming, and running back and forth. People were also standing on tables.
*68 The extent and degree of the disorder resulting from the conduct of the defendant in resisting arrest are not clear. One witness described the scene as “chaotic”. Another testified that the “scuffle” or “tussle” between Officer Bradford and the defendant was “not that major.” There was also evidence that there was only a “fairly small amount” of shouting from the crowd.
However, it is clear from the record that the conduct of the defendant and that of his two companions in forcibly resisting arrest constituted “tumultuous and violent conduct.” Their conduct had passed beyond the state of aggressive and irritating solicitation to that of forceful and violent resistance to lawful authority.
Although the other demonstrators did not resist arrest, Officer Charles E. Reedy testified that, while the defendant was resisting, there were “comments from the back (of the cafeteria where these other demonstrators were located) proclaiming May Day, wanting the people in the crowd to come up and help them.” There was additional testimony that “there were several comments made coming from the crowd .... Some were referring to get them out of here, and some were referring to leave them alone.” The commentators could not be identified.
Officer Bradford testified that “two or three (of the people in the cafeteria) had been involved in making comments against the police and toward the defendants.” He also stated that “some of the people that they (the defendants) had exhorted had come to their cause.”
After the defendant had been subdued and removed from the cafeteria, several officers returned and found three white females, Rene Romonoff, Eugene Hicks, and Myra Delay, in the back of the cafeteria chanting “free the hospital slaves” and trying to hand out their material.
“(A) riot may be committed, often in combination with another offense .... Intimidating or resisting civil officers may constitute a riot . .. . ” 77 C.J.S. Riot, Section 3 (1952). See also State v. Winkels, 204 Minn. 466, 283 N.W. 763 (1939); State v. Seeley, 51 Or. 131, 94 P. 37 (1908). While our statute does not require “an unlawful assembly” as an essential element of riot, as required under common law, 54 Am.Jur.2d Mobs and Riots, Section 15 (1971), it is well settled that:
“An assembly may, at its commencement and for some time thereafter be perfectly lawful, yet subsequently become unlawful, or even riotous, due to its actual conduct, or to a concerted intention to break the peace. When an assembly, however lawful it may have been previously, begins to riot it is no longer lawful but becomes an unlawful assembly.”
W. Burdick, 3 The Law of Crime, Section 758 (1946).
The facts of this case establish that the defendant “wrongfully engage(d) in tumultuous and violent conduct” in resisting arrest. Thus one essential element of the statutory crime of riot is established.
II
The defendant argues that there is no evidence that he engaged in the tumultuous and violent conduct with five or more other persons. The defendant and seven other members of the “May Day” Committee entered the cafeteria with a common purpose. From the evidence it may be inferred that this purpose, at least originally, was to proclaim the views of the committee and solicit support and money for their cause. However, once the police attempted to arrest the defendant, the purpose shifted to assisting the defendant resist arrest. That this was the objective and purpose of Ernest Brown and Ms. Jue cannot even be disputed for they actively and physically aided the defendant in resisting arrest. That others present in the cafeteria vocally supported the defendant is equally as clear. Officer Bradford testified that “two or three (of the occupants of the cafeteria) had been involved in making comments against the police and toward the defendants” during the time the police were attempting to subdue and arrest the defendant. Bradford also stated that some of the people the defendant had exhorted had come to their *69 cause. It is reasonable to conclude from this that occupants of the cafeteria, other than the members of the original group, were lending verbal support to the defendant in his struggle to overcome the police. In determining the sufficiency of the evidence, this Court must accept as true the evidence introduced by the State and accord the State all legitimate inferences therefrom. The evidence must be considered in the light most favorable to the prosecution. Johnson v. State, 378 So.2d 1164 (Ala.Cr. App.), cert. quashed, Ex parte Johnson, 378 So.2d 1173 (Ala.1979).
If the jury believed that at least three others, besides Ms. Jue and Ernest Brown, were verbally encouraging the defendant, this would satisfy the statutory requirement of “five or more other persons.”
“Any person who encourages, incites, promotes, or takes part in a riot is guilty of riot as a principal.” 54 Am.Jur.2d Mobs and Riots, Section 20. “If persons are present in order to lend the courage of their presence to the rioters, or to assist, if necessary, they may be equally guilty with the principals.” 77 C.J.S. Riots, Section 17.
The quality and quantity of participation required are explained in 3 Burdick, Section 759.
“Although a riot cannot be committed by one person alone, or, at common law, by two persons, yet three or more persons may be rioters without doing the same act, and, it is not necessary that all should physically participate in the actual violence. The riotous act or acts may be done by only one of them, yet if the others aid, encourage, or promote his act by words, signs, or gestures, they are principals equally with him. If three or more persons are engaged in executing a common purpose by means of force and violence, under circumstances which amount to a breach of the peace and alarming to the public, they are guilty of riot though the act of each is separate from that of the others. In other words, there must be a common purpose, but, not, necessarily, a common act. Some cases hold that there must be ‘concerted action’ in riot. But concerted action, or acting conjointly in execution of a common purpose or plan, is not synonymous with identical action.
“Mere presence does not make one a participant in a riot but if one does something which incites, encourages, or assists in the actual perpetration of the crime, he is an aider and abettor. However, as Wharton, quoting the words of Judge Daly, says: ‘Even well-disposed citizens are attracted by excitement * * * and a distinction must be carefully drawn between those who were mere lookers-on and those who were stimulating and encouraging the riot.’ ”
The commentary to Section 13A-11-3 supports the finding that those who vocally supported the defendant were equally guilty of riot.
“One may engage in violent and tumultuous conduct by knowingly and intentionally aiding or encouraging it ‘by acts, gestures or words.’ Any conduct which tends to enlarge and perpetrate the atmosphere of violence and tumult, if done intentionally or recklessly, falls within the purview of the section since riot ‘is a phenomenon which feeds on itself and for which the cooling influence is the cessation of activity which tempts others to swell to the throng and to engage in similar acts.’ United States v. Matthews, supra (419 F.2d 1177 (D.C.Cir.1969)). Therefore one who considers he is merely an innocent bystander ‘enjoying the show’ falls within the statute if he intentionally refuses or fails to disperse from the disturbance upon lawful order of the police or other legally constituted officials. His physical presence may add fire to the fuel just as one who ‘eggs’ another on, even though he is not actually participating in an overt act of violence.”
It is insignificant whether or not those verbally supporting the defendant were members of the May Day Committee who entered the cafeteria. Even if these supporters were employees of the University, rightfully and lawfully in the cafeteria, they became participants in the riot by en *70 couraging the defendant’s tumultuous and violent conduct.
Ill
The defendant argues that the patrons of the cafeteria viewed the defendant and his companions as nothing more than a curiosity. This is contrary to Officer Bradford’s testimony.
“Q. Before there was contact between you and Mr. Campbell, did there appear to be a public terror or alarm there among the people around him?
“A. Very possibly.
“Q. Not possibly. Was there? Did you observe, what appeared to be terror in the people around him, public alarm or not?
“A. Are you asking me if I saw terror in a number of people’s faces, yes.
“Q. Right around him?
“A. Yes.
“Q. What was he doing that was creating terror in those people there in that cafeteria on that occasion, what was Mr. Campbell doing?
“A. Apparently—
“Q. No apparently. What did you see him doing?
“A. That’s what I saw.
“THE COURT: Just described it in detail.
“THE WITNESS: The looks that I received from a number of people there eating, including visitors, one particular lady was very alarmed and got up and ran to another area of the cafeteria.”
This testimony satisfies the statutory element of the crime of riot that the conduct of the accused “intentionally or recklessly causes or creates a grave risk of public terror or alarm.”
“To constitute a riot it is not necessary that there should be actual fright to the public generally. It is enough if the action of the parties implicated be so violent and tumultuous as to be likely to cause fright, and if individuals are frightened.” Salem Mfg. Co. v. First American Ins. Co., 111 F.2d 797, 803 (9 Cir. 1940).
Our statute only requires conduct which “intentionally or recklessly causes or creates a grave risk of public terror or alarm.” (Emphasis added) This is not the equivalent of conduct which actually causes or creates public terror or alarm. Under our statute only the “grave risk” of causing or creating such is enough. Even the ingredient of terror excited does not require that more than one person be alarmed. 77 C.J.S. Riot, Section 7. See also People v. O’Laughlin, 3 Utah 133, 1 P. 653 (1882).
“At common law, it is an essential element of riot that the common purpose is carried out in a violent and turbulent manner to the terror of the people. ‘It seems to be clearly agreed’, says Hawkins, ‘that in every riot there must be some such circumstances either of actual force or violence, or at least of an apparent tendency thereto, as are naturally apt to strike a terror into the people.’ And Stephen says that a riot is an unlawful assembly executing its purpose ‘by a breach of the peace, and to the terror of the public.’ This does not mean however, that any large number of persons must be alarmed, for it is held that if the circumstances are calculated to cause fright it is sufficient if only a few persons, or even only one person is actually put in fear. Statutory definitions of riot may omit the element of terror or fear, merely providing that if a designated number of persons commit acts in a violent and tumultuous manner they shall be guilty of riot, and under such statutes it may not be necessary that a riotous act should be terrifying to the public or that anyone should be put in fear. Other statutes, however, may expressly define the violence to be such as creates public alarm or consternation, or terrifying or calculated to terrify people, or, at least, one person.” 3 Burdick, Section 764.
Here the State not only proved the grave risk of public terror or alarm but, through Officer Bradford’s testimony, proved that a number of people were terrified and that one lady was very alarmed.
*71 IV
The trial judge charged the jury: “It does not matter how many people are terrified or alarmed, whether it be one or a hundred people, but that there was a grave risk and cause — or it either caused or there was a grave risk that it would cause or create a grave risk of terror or alarm.”
The giving of this charge was not error.
In holding that the terror inflicted by rioting inmates on the director of the department of corrections whom they held hostage satisfied the “public disturbance” requirements of the District of Columbia Riot Statute, the United States Court .of Appeals for the District of Columbia held:
“MOREOVER, ‘(t)he ingredient of terror excited does not require that more than one person be alarmed.’ To this end Wharton states:
“If the nature of the defendants’ conduct is calculated to induce fear or terror, the offense is riot even though only a few or merely one person was in fact terrified.”
“2 F. Wharton, Criminal Law and Criminal Procedure, Section 865 at 732 (R. Anderson ed. 1957). See also State v. Acra, 2 Ind.App. 384, 28 N.E. 570 (1891); People v. O’Laughlin, 3 Utah 133, 1 P. 653, 659 (1882), citing Bishops, Criminal Law, Section 1148; State v. Powell, 70 N.C. 67 (1874); Darst v. People, 51 Ill. 286, 2 Am.Rep. 301 (1869); State v. Boies, 34 Me. 235 (1852); 77 C.J.S. Riot at 427 (1952).”
Our review convinces us that the defendant’s conduct constituted riot. Though not as violent as it might have been, it clearly constituted that type of “mindless, insensate violence and destruction unredeemed by any social value and serving no legitimate need for political expression” characterized in United States v. Matthews, 419 F.2d 1177, 1182 (D.C.Cir.1969).
We have searched the record and found no preserved error prejudicial to the substantial rights of the defendant. The judgment of the Circuit Court is affirmed.
AFFIRMED.
All Judges concur.